COMMITTEE ON PROFESSIONAL
ETHICS AND CONDUCT OF THE
IOWA STATE BAR ASSOCIATION,
Appellant,

v.

James L. CHIPOKAS, Appellee.

No. 92–1249.

Supreme Court of Iowa.

Dec. 23, 1992.

Rehearing Denied Jan. 22, 1993.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for appellant.

Edward M. Blando and James W. Affeldt of Elderkin & Pirnie, P.C., Cedar Rapids, for appellee.

McGIVERIN, Chief Justice.

The Committee on Professional Ethics and Conduct appeals from a report of the Grievance Commission in this attorney disciplinary proceeding wherein the commission recommended suspension of respondent James L. Chipokas' license to practice law. Respondent cross-appeals. We conclude the suspension should be for one year.

I. *Background facts and proceedings.* Chipokas is an attorney practicing in Cedar Rapids. He was admitted to the Iowa Bar in 1960. He has been reprimanded once before, in 1990, for ethical violations involving conflicts of interest.

A. *The Vest matters.* Robert Vest, now fifty-four, incurred a serious head injury in the mid–1960s. In addition, he apparently has great difficulty reading.

In 1985, Vest was injured during his employment with the City of Cedar Rapids. In October 1987, Vest rejected a $24,000 offer from the city's workers' compensation carrier to settle the claim arising from his employment-related injuries. Shortly thereafter, Vest employed Chipokas to represent him on this claim.

Vest apparently told Chipokas to get all settlement offers in writing so that he could consult with trusted friends regarding the offers. Vest testified that he never gave Chipokas authority to settle the case outright for a specific amount.

Chipokas and Vest immediately entered into a contingency fee agreement prepared by Chipokas. It was signed December 3. The written agreement provided that Chipokas' fee was to be one-third of the *net* recovery over $24,000, *regardless of whether the case was settled or tried.*

The city's insurance carrier then offered $33,000 to settle the claim, but Vest rejected this offer also. It soon became apparent that the case would have to go to trial. The carrier withdrew the settlement offer. Chipokas then filed a petition on behalf of Vest before the Iowa Industrial Commissioner.

As a result, on February 2, 1988, Chipokas insisted that Vest sign a new fee agreement. The new agreement provided that Chipokas' fee would be one-third of the *gross* recovery, rather than the net recovery, including the first $24,000. Chipokas explained the new agreement was necessary because the case would now have to be tried, meaning more work for him. Vest did sign the new contract.

Chipokas did not explain to Vest that the services he agreed to perform under the second agreement were identical to those he agreed to perform under the first agreement. Chipokas did not tell Vest that Vest could have required him to go forward under the first agreement, nor did he advise Vest to consult independent counsel before signing the new agreement. In fact, Chipokas threatened to withdraw from the case if Vest refused to sign the new agreement.

Additional contacts were made between Chipokas and counsel for the carrier. On November 6, Chipokas sent a letter to opposing counsel in the case stating that Vest "today finally made his decision to accept the forty-five thousand dollars ($45,000) that was last offered...." When opposing counsel did not respond, Chipokas sent another letter, dated November 21, stating that "our offer to settle this matter" would be valid only for another three days.

Apparently, the offer was accepted by the deadline. Chipokas sent Vest a letter dated November 27 informing Vest he had settled the case for $45,000. Vest, upset that Chipokas settled the case allegedly

without authority, then fired Chipokas and engaged other counsel.

At some point, a complaint was made to the Ethics Committee regarding these matters.

B. *The Kula matters.* David Kula, a disabled veteran, received a brain injury during combat in Vietnam in 1969. He also suffers from exposure to Agent Orange and from post-traumatic stress disorder attributable to his war experience.

In June 1985, Kula was involved in an automobile accident during his employment with an equipment company. His neck and back were injured, and his brain injury was aggravated. Kula retained Chipokas to pursue his claim for damages resulting from this accident.

On October 5, Kula and his wife entered into a fee agreement with Chipokas which provided that Chipokas' fee was to be one-third of the *net* recovery remaining after payment of all expenses.

At the same time, Chipokas undertook to represent the subrogation interest of The Travelers Insurance Company for workers' compensation benefits and medical bills it had paid to or on behalf of Kula. The amount of Travelers' interest was $25,969.68. Chipokas' fee for representing Travelers was to be one-third of this amount.

Chipokas eventually negotiated a settlement of $122,500 on all claims based on Kula's injury. Upon receipt of the settlement check, Chipokas calculated his one-third contingency fee for representing the Kulas from the *gross* recovery, rather than from the net recovery as outlined in the fee agreement, and without first deducting Travelers' share or any expenses. Accordingly, Chipokas paid himself a fee of $40,843.56 (within $10.00 of one-third of the gross) for representing the Kulas, plus another fee of $8,656.56 for representing Travelers (one-third of $25,969.68). Thus, Chipokas received a total fee of approximately $49,500. He then disbursed $50,809 to the Kulas and presumably the remainder to Travelers. Chipokas overcharged the Kulas approximately $10,000.

During this disbursement meeting with the Kulas, Chipokas outlined these figures on a yellow legal pad. Mrs. Kula asked at one point if Chipokas was taking his fee "off the top" or after everyone was paid. Chipokas merely answered, "Trust me. I'm the lawyer."

Over the next several years, the Kulas continued to ask Chipokas for an accounting of the settlement disbursements. Chipokas never complied with these requests.

At some point, a complaint was made to the Ethics Committee regarding these matters. As of the date of the commission hearing, Chipokas had the use of the Kulas' money for over five years.

C. *Grievance Commission findings.* Ultimately the Ethics Committee filed a complaint before the Grievance Commission on these matters. Upon hearing the complaint, the Grievance Commission found Chipokas had violated various provisions of our Code of Professional Responsibility by settling Vest's case without authority, collecting an excess fee from the Kulas, and failing to provide an adequate accounting to the Kulas upon request. The commission did not find ethical violations regarding Chipokas' negotiation of a new fee agreement with Vest.

The commission recommended a one-month suspension of Chipokas' license. The Ethics Committee applied for permission to appeal pursuant to Iowa supreme court rule 118.11, which we granted. The committee appeals 1) the commission's finding of no ethical violations regarding Vest's second fee agreement, and 2) the one-month suspension recommendation as too lenient. Respondent cross-appeals.

We initially note that we review de novo the record made before the commission. Iowa Sup.Ct.R. 118.11. Although we respectfully consider the commission's findings, such findings are not binding on this court. *Committee on Professional Ethics & Conduct v. Conzett,* 476 N.W.2d 43, 44 (Iowa 1991). The committee has the burden of proving the complaint's allegations by a convincing preponderance of the evidence. *Id.*

**II.** *Renegotiating Vest's fee agreement.* As outlined above, Chipokas and Vest first signed a fee agreement on December 3, 1987, giving Chipokas a fee of one-third of the net recovery above $24,000. The agreement stated this was to be the fee regardless of whether the case was settled or tried.

When Chipokas realized the case would have to be tried, he insisted that Vest sign a new agreement of February 2, 1988, providing for a larger fee of one-third of the *gross* recovery, including the first $24,000.

We recognized in *Lawrence v. Tschirgi*, 244 Iowa 386, 389, 57 N.W.2d 46, 48 (1953), that a lawyer has a higher duty to a client regarding contracts made during the existence of the attorney-client relationship than he does regarding contracts made at the beginning of the relationship. While contracts made during the attorney-client relationship are not void, they are "viewed with suspicion and closely scrutinized by the courts...." *Id.* Furthermore, "[t]here is a presumption of unfairness ... attaching to a contract for compensation made after the relationship has been established...." *Id.* The attorney has the burden to show such a contract was "fairly and openly made, that the client was fully informed concerning it and understood its effect." *Id.* at 389–90, 57 N.W.2d at 48.

Here, Chipokas failed to inform Vest that he could be held to perform under the first contract, that the services contracted for in the two agreements were identical, or that Vest should seek independent counsel before signing the second agreement. Chipokas even went so far as to threaten to withdraw from the case if Vest did not sign the new fee agreement.

We conclude Chipokas failed to meet his burden as set out in *Lawrence* and violated several ethical provisions in the process.

By putting his own greed ahead of Vest's interests, Chipokas has violated EC 2–8 ("[e]very consideration of personal advantage or profit must be subordinated to the interest and welfare of the client") and EC 5–1 (lawyer must exercise professional judgment solely for benefit of client and free of compromising influences and loyalties, including lawyer's personal interests).

In failing to advise Vest that the services under the two contracts were identical, that Vest should obtain advice from independent counsel before signing the second contract, and that Vest could compel Chipokas' performance under the original contract, Chipokas has failed to maintain high standards of professional conduct as required by EC 5–1 and has engaged in conduct adversely reflecting on his fitness to practice law in violation of DR 1–102(A)(6). Chipokas further violated EC 5–1 and DR 1–102(A)(6) by threatening to withdraw if Vest did not sign the second fee agreement.

**III.** *Settling Vest's case without authority.* Vest allegedly directed Chipokas to write out all settlement offers received so that he could have trusted friends read the offers and give him their advice. Vest claims he never gave Chipokas any further authority for accepting or making offers and that Chipokas had no authority to settle for a specific amount. Vest's testimony was corroborated by other evidence at the commission hearing.

Judge Brady of the district court in Benton county addressed this issue when the City of Cedar Rapids subsequently sued Vest for specific performance of the $45,000 settlement. After a trial on the matter, Judge Brady specifically found that Chipokas did not have any authority beyond receiving offers. Judge Brady noted that Chipokas, who testified at the hearing by way of deposition, was at all times very careful to "say he assumes he had the authority and makes some very broad generalizations." Judge Brady observed, as do we, that nowhere does Chipokas say he definitely had the authority to settle for a specific amount.

EC 7–7 outlines which decisions in a legal matter are within the province of the attorney and which are within the province of the client. EC 7–7 specifically sets out that it is solely the client's decision whether to accept a settlement offer. By accepting the $45,000 offer without Vest's approval or authority, Chipokas violated EC 7–7.

Chipokas has also violated EC 2–8 (lawyer should promote client's interest and welfare, and not abuse client's trust) in that he accepted a settlement offer without authority, thereby abusing Vest's trust in him to only receive written offers for consideration.

Additionally, in the course of accepting the offer Chipokas misrepresented to the opposing counsel that he had authority to settle. This misrepresentation violates DR 1–102(A)(4) (lawyer shall not engage in conduct involving misrepresentation). This, as a result, reflects adversely on Chipokas' fitness to practice law in violation of DR 1–102(A)(6).

Finally, Chipokas' unauthorized acceptance of the settlement offer resulted in the City of Cedar Rapids suing Vest for specific performance of the alleged settlement. Chipokas' actions caused Vest to retain other counsel and defend himself in the action. In addition, the Benton County district court had to take valuable time to hear that suit, which would not have been filed except for Chipokas' unauthorized conduct. We consequently conclude Chipokas' conduct was thus prejudicial to the administration of justice in violation of DR 1–102(A)(5).

■ IV. *Collecting an excessive fee from the Kulas.* Chipokas' fee agreement with the Kulas permitted a fee of one-third of the *net* recovery. Under this agreement, then, Chipokas *should* have first subtracted The Travelers' interest of $25,969.68 and any expenses from the total settlement of $122,500. This would leave a net recovery of $91,542.17 for the Kulas' personal claim. One-third of $91,542.17, Chipokas' fee for representing the Kulas, would be $30,514.06. Additionally, Chipokas' fee for representing Travelers would be one-third of $25,969.68, or $8,656.56. Accordingly, Chipokas' total fees would equal $39,170.62.

Instead, however, Chipokas paid himself one-third of the *gross* $122,500 settlement as Kulas' fees, and then additionally paid himself another one-third of Travelers' interest, for a total fee of approximately $49,500.00. This "double-charging" result-ed in the Kulas being overcharged by more than $10,000.00.

Chipokas claims this was an honest mistake because he had never represented both a plaintiff and an insurance company's subrogated interest at the same time, and so did not understand how the fees should be disbursed. However, we do not accept this excuse in light of the fact that Chipokas did not acknowledge his mistake for five years despite the Kulas repeated requests for an accounting of the settlement, and only then when the Ethics Committee filed a complaint against him.

Accordingly, we conclude Chipokas elevated his personal interest above the Kulas' interests in violation of EC 2–8 (attorney must subordinate personal advantage or profit to the interests and welfare of client). Chipokas also charged an excessive fee as prohibited by EC 2–19 and DR 2–106(A). As such, Chipokas' actions have reflected adversely on his fitness to practice law as set forth in DR 1–102(A)(6), and he has violated disciplinary rules as proscribed by DR 1–102(A)(1).

■ V. *Failure to provide an accounting.* Chipokas did not give the Kulas a copy of the yellow legal pad sheet on which he figured his fees the day they received their disbursement. Chipokas brushed aside Mrs. Kula's questions regarding how he was figuring his fees, and refused to provide an accounting of the settlement disbursements despite repeated requests.

By failing to render an accounting to the Kulas, Chipokas has violated DR 9–102(B)(3) (lawyer shall render accounting to client regarding client property) and DR 9–102(B)(4) (attorney shall promptly pay to client funds in attorney's possession to which client is entitled).

■ VI. *Disposition.* Finally, we believe the standard of an attorney's conduct is elevated where a client has a less than full mental or functional capacity. *See In re Witte,* 615 S.W.2d 421 (Mo.1981). Chipokas' conduct is all the more egregious in light of Vest's and Kula's head injuries and partial resulting impairments.

We conclude Chipokas has violated several ethical considerations and disciplinary rules as set forth above. The record also shows Chipokas has been disciplined once before. When determining an appropriate sanction, we consider the attorney's involvement in previous disciplinary proceedings. *Committee on Professional Ethics & Conduct v. Hurd,* 375 N.W.2d 239, 246 (Iowa 1985). The Grievance Commission recommended a one month suspension. We may impose a greater or lesser sanction on Chipokas than recommended by the commission. *See* Iowa Sup.Ct.R. 118.-10.

Based upon the foregoing record, we conclude a longer suspension is in order. We suspend Chipokas' license to practice law indefinitely with no possibility of reinstatement for one year from the date of this opinion. See Iowa Sup.Ct.R. 118.12. Costs should be taxed to Chipokas pursuant to Iowa supreme court rule 118.22.

LICENSE SUSPENDED.

All justices concur except SCHULTZ and CARTER, JJ., who take no part.