**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Appellee,**

v.

**Donna LESYSHEN, Appellant.**

No. 98–869.

Supreme Court of Iowa.

Oct. 21, 1998.

---

Donna Lesyshen, pro se, for appellant.

Norman G. Bastemeyer and David J. Grace, Des Moines, for appellee.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN,* JJ.

LAVORATO, Justice.

This matter is before us on the appeal of attorney Donna Lesyshen from the findings of the Grievance Commission of the Iowa Supreme Court that her license to practice law should be suspended. Iowa Supreme Court Rule 118.11 permits this appeal. The Iowa Supreme Court Board of Professional Ethics and Conduct cross-appeals from the commission's findings. Iowa Supreme Court Rule 118.11 likewise permits the cross-appeal and authorizes this court to "grant such appeal in a manner similar to the granting of

interlocutory appeals in civil cases under the Iowa Rules of Appellate Procedure."

The board filed a three-count complaint against Lesyshen. Count I alleged she neglected a personal injury lawsuit of her client, Charlene Hepler. Count II alleged she signed Hepler's name in that case to answers to interrogatories and falsely notarized the signature. Count III, concerning another client, Shawn Burt, alleged she improperly obtained an *ex parte order* placing temporary custody of a child with Burt.

The commission found no ethical violations regarding Count I; however, it did find ethical violations regarding Counts II and III. The commission recommended we suspend Lesyshen's license to practice law for sixty days. Lesyshen appealed. The board cross-appealed from the commission's findings on Count I and from the commission's recommendation regarding the length of the suspension.

We conclude Lesyshen's misconduct calls for a more severe sanction. We therefore suspend her license to practice law in Iowa indefinitely with no possibility of reinstatement for six months from the date of this opinion.

 Our review under Rule 118.11 is de novo. Iowa Sup.Ct. R. 118.11. The commission's findings are not binding, but we accord them respectful consideration. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman,* 557 N.W.2d 94, 95 (Iowa 1996). We ultimately decide what discipline is appropriate under the unique facts of each case. *Id.* We give weight to the commission's findings, particularly when considering the credibility of witnesses. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hughes,* 557 N.W.2d 890, 892 (Iowa 1997). The board must prove its allegations of lawyer misconduct by a convincing preponderance of the evidence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mayer,* 570 N.W.2d 647, 648 (Iowa 1997). This burden of proof is greater than that in a civil case but less than that in a criminal case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Postma,* 555 N.W.2d 680, 681 (Iowa 1996).

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1997).

Lesyshen graduated from law school in 1982. She has served as a prosecutor in the Black Hawk County Attorney's office and as assistant city attorney for the city of Waterloo. Following her tenure as assistant city attorney, she entered private practice. She has a general practice, which includes trial work.

## I. The Hepler Matter.

**A. The neglect charge.** On December 10, 1991, Hepler was injured in an auto collision. Hepler was a back seat passenger in a vehicle driven by Lynn Schares. Schares lost control of the vehicle on a curve.

Hepler hired Lesyshen to represent her on her claim against Schares. ·Lesyshen had previously represented Hepler in Hepler's divorce action.

In November 1992, Lesyshen made a $200,000 demand on Schares' insurer to settle Hepler's claim. The claim was not settled. On February 4, 1993, Lesyshen filed suit against Schares on Hepler's behalf, seeking past and future medical expenses, past and future lost wages, and past and future pain and suffering.

John T. McCoy represented Schares in the lawsuit. From the beginning, Lesyshen was dilatory. On March 1, 1993, McCoy served interrogatories to be answered by Hepler's medical experts. Despite numerous letters from McCoy, two motions to compel, and two court orders compelling the answers, Lesyshen never did provide the answers. Because of this failure, the trial court sustained McCoy's motion in limine to preclude expert testimony of matters beyond those revealed in the medical records. As a result, McCoy was able to successfully argue that there was a lack of proper foundation to connect to the accident most of the medical bills and future damages.

More specifically, the ruling precluded the recovery of medical bills other than those of a treating chiropractor and radiologist. At trial, Lesyshen tried to introduce medical expenses totaling $15,339.14, but the court only allowed her to introduce $3,086.33. The ruling also precluded any chance for recovery for future damages such as future pain and

suffering, future medicals, and loss of earning capacity.

McCoy also submitted an interrogatory regarding lay witnesses. In response, Lesyshen listed ten witnesses. When Lesyshen supplemented this answer shortly before trial, she listed only four: Hepler's mother, sister, husband (Hepler married shortly before trial), and son. Lesyshen had listed none of these witnesses on the initial list of witnesses.

McCoy argued that listing these new witnesses close to trial prejudiced his case. The court agreed and sustained McCoy's motion in limine to exclude three of the four witnesses in Hepler's case in chief. In Hepler's case in chief, only Hepler, her husband, and her chiropractor testified. The court, however, did allow the excluded witnesses to testify on rebuttal.

Another instance of Lesyshen's dilatory conduct occurred while Hepler's case against Schares was pending. The case was automatically dismissed pursuant to Iowa Rule of Civil Procedure 215.1. Fortunately, Lesyshen was able to have the case reinstated.

Lesyshen conducted no discovery. McCoy was thus able to catch Hepler off-guard. McCoy offered a series of photographs showing Hepler smiling and enjoying herself after the accident. This was in stark contrast to Hepler's continuing complaints of pain and suffering. Hepler insisted the photographs were taken before the accident. McCoy produced four witnesses who said they were taken after the accident. Had Lesyshen requested production of exhibits McCoy intended to introduce, Hepler might have been in a better position to respond to McCoy's questioning.

Lesyshen's passive attitude toward discovery allowed McCoy to catch Hepler off-guard on several other important points. McCoy took Hepler's deposition more than a year-and-a-half before trial. Lesyshen chose not to order a copy of the deposition, supposedly because it was cost-prohibitive for her client. Consequently, Hepler had no opportunity to review her deposition testimony before testifying. Not surprising, Hepler's testimony

contained several damaging inconsistencies between her deposition and trial testimony.

Lesyshen's dilatory behavior continued right into trial. Hepler's treating chiropractor was the only medical witness to testify for Hepler. Lesyshen had her secretary notify the chiropractor the day before trial that he was to testify. The chiropractor had to reschedule patients to comply with the subpoena Lesyshen had served upon him. Lesyshen had not been in recent contact with the chiropractor and had to go over his testimony with him at the courthouse.

The jury found that Hepler was 45% at fault for her injuries and Schares was 55% at fault, and it awarded Hepler $12,186.33. The award included $3,086.33 for past medical expenses, $5100 for loss of past wages, and $4000 for past pain and suffering. After the court reduced the award because of Hepler's comparative fault and because of a credit for medical expenses paid by Schares' insurer, Hepler was left with an award of $2,041.69.

The credit for medical expenses raises a final question about Lesyshen's conduct in representing Hepler. In Schares' answer, McCoy asserted a claim for a setoff for medical expenses paid by Schares' insurer. The insurer paid $5000 of Hepler's medical expenses and obtained a subrogation receipt from Hepler for this amount. The subrogation receipt entitled the insurer to a setoff for medical expenses paid against any recovery Hepler might obtain against Schares.

Lesyshen failed to offer into evidence the $5000 of paid medical expenses; she only attempted to offer the amount of unpaid medical expenses. She failed to make this offer despite McCoy's pretrial inquiry about how she was going to prove the $5000 of medical expenses paid by Schares' insurer. In a posttrial motion, McCoy raised the setoff question and was able to further reduce Hepler's recovery by the $5000 setoff. Left with unpaid medical expenses of $15,000, Hepler—at Lesyshen's suggestion—sought bankruptcy.

**1. The charge and the commission's findings.** Count I of the complaint charged that Lesyshen's neglect in handling Hepler's lawsuit violated DR 6–101(A) and DR 1–102(A)(6) of the Iowa Code of Professional Responsibility for lawyers. DR 6–101(A) provides that a lawyer shall not

(1) Handle a legal matter which the lawyer knows or should know that the lawyer is not competent to handle....

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a client's legal matter.

DR 1–102(A)(6) prohibits a lawyer from engaging in conduct adversely reflecting on the lawyer's fitness to practice law.

The commission concluded that while Lesyshen was negligent in her handling of Hepler's case, it could not say that Lesyshen committed an ethical violation by "handling a legal matter without adequate preparation in the circumstances." In reaching this conclusion, the commission believed Hepler's small jury award was self-inflicted because the jury apparently did not believe she had taken sufficient action to improve her own health by losing weight or exercising as some of her treating doctors had recommended.

**2. The merits.** Clearly, the commission focused on subsection 2 of DR 6–101(A): "A lawyer shall not handle a legal matter without preparation adequate in the circumstances." It should have focused on subsection 3: "A lawyer shall not neglect a client's legal matter."

For reasons that follow, we agree with the board that the factual scenario we detailed earlier establishes neglect by a convincing preponderance of the evidence.

We have recognized that "each case of neglect turns on the particular facts." *Committee on Prof'l Ethics & Conduct v. Rogers,* 313 N.W.2d 535, 536 (Iowa 1981). Canon 6 does not define "neglect," but EC 6–4 gives some guidance: "In addition to being qualified to handle a particular matter, a lawyer's obligation to a client requires adequate preparation for and *appropriate attention to legal work.*" EC 6–4 (emphasis added).

Admittedly, there is a difference between professional neglect and mere inadvertence or errors involving professional judgment. We have approved the following distinction between the two:

[I]ndifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client [is professional neglect amounting to an ethical violation of DR 6–101(A)(3) ]. The concept of ordinary negligence is different. Neglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of an error of judgment made in good faith.

*Rogers,* 313 N.W.2d at 536 (quoting with approval ABA Comm. on Prof'l Ethics, Informal opinions, No. 1273 (1973)); *accord Committee on Prof'l Ethics & Conduct v. Martin,* 375 N.W.2d 235, 237–38 (Iowa 1985).

Here there was more than a single act or omission. Ignoring two motions to compel, two court orders, and numerous letters from opposing counsel to answer interrogatories can hardly be characterized as mere inadvertence or the result of an error of judgment made in good faith. The same can be said of Lesyshen's inaction resulting in the case being dismissed under Rule 215.1.

Nor can we say that waiting until the last moment to confer with her client's lone medical witness and having to subpoena him were mere inadvertences. Moreover, Lesyshen's dilatory discovery practices put Hepler in the awkward position of having to wait for rebuttal to use her lay witnesses.

Contrary to the commission's belief, the failure to answer the interrogatories, we believe, was devastating to her client's case. Instead of the jury considering $20,000 in medicals, it could only consider $3,086.33. Additionally, the jury was deprived of hearing any evidence concerning any future damages. Moreover, because of Lesyshen's cavalier attitude, McCoy was able to add insult to injury by claiming an offset of $5000 to an already paltry award.

We agree with the board's characterization: "Because of [Lesyshen's neglect,] what began as a case of clear liability with over $20,000 in medical bills and ample insurance coverage, ended with a $2000 judgment, resulting in her client's bankruptcy."

We conclude Lesyshen violated DR 6–101(A)(3) in that she neglected a client's legal matter. In addition, she violated DR 1–102(A)(6) by engaging in conduct that adversely reflected on her fitness to practice law.

**B. The forgery and false notarization.** At trial of her personal injury suit, Hepler testified that she had signed supplemental answers to interrogatories propounded by McCoy. The truth was that Lesyshen had forged her client's signature to the supplemental answers and falsely notarized the signature. Lesyshen stood mute during Hepler's testimony about the answers, doing nothing to correct the testimony.

Before the disciplinary hearing, Lesyshen admitted signing Hepler's name to supplemental answers to interrogatories, which were filed with the court. During her testimony before the commission, Lesyshen admitted she tried to make the signature look like Hepler's, rather than signing her own name or initialing the signature as the rule requires. *See* DR 9–102(B)(1) ("A lawyer signing an instrument in a representative capacity shall so indicate by initials or signature."). To us, she characterizes this conduct as "merely an error." She continues to insist as she did before the commission that her client requested her to sign the answers. Hepler vehemently denied this before the commission. The commission did not believe Lesyshen. Neither do we.

The board proved its allegations that Lesyshen violated DR 7–102(A)(5) (in representing a client, a lawyer shall not "[k]nowingly make a false statement of law or fact" ) and DR 1–102(A) (a lawyer shall not engage in illegal conduct involving moral turpitude; engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; engage in conduct that is prejudicial to the administration of justice; or engage in any other conduct that adversely reflects on the fitness to practice law). We have severely condemned similar unprofessional conduct in other cases. *See, e.g., Committee on Prof'l Ethics & Conduct v. Hutcheson,* 504 N.W.2d 898, 899 (Iowa 1993) (holding it was manifestly unprofessional for lawyer to offer his notarization signature and seal to unsigned documents,

later obtaining the necessary signatures); *accord Committee on Prof'l Ethics & Conduct v. Bauerle,* 460 N.W.2d 452, 453 (Iowa 1990).

## II. The Pircer Matter.

Count III arises from a complaint lodged by Marguerite Pircer against Lesyshen regarding an *ex parte* order. Lesyshen secured the order, which transferred the physical custody of Pircer's child to Lesyshen's client, Shawn Burt. Pircer and Burt were not married, but they had a minor daughter who lived with Pircer.

Burt visited Pircer's home and was verbally abusive and acted in a threatening manner. Burt was later convicted of trespass because of this incident.

Pircer retained attorney Max Kirk. In a letter to Burt, Kirk indicated that Burt's future visits with his daughter should only occur under "structured and controlled circumstances." Kirk also advised Burt to seek an attorney. Burt then retained Lesyshen.

Lesyshen filed a custody suit on behalf of Burt and on the same day obtained the *ex parte* order. In the petition, Lesyshen alleged that Pircer would not allow visitation unless "under structured and controlled circumstances." Before obtaining the order, Lesyshen neglected to notify Kirk of her intent to do so. In her testimony before the commission, Lesyshen insisted she was unaware of Kirk's letter to Burt. Burt also testified he did not tell Lesyshen about the letter.

The commission believed neither Lesyshen nor Burt. Apparently, the commission was not convinced that the language "under structured and controlled circumstances" in the custody petition—the same language Kirk used in his letter to Burt—was a mere coincidence. Nor are we convinced. We find that Burt did make Lesyshen aware of Kirk's letter *before* she obtained the *ex parte* order.

Kirk was able to quash the *ex parte* order and return the child to Pircer. The parties later reached an agreement on custody and visitation.

■ We find the board has proved its allegations that Lesyshen violated DR 7–110(B), which provides:

> In an adversary proceeding, a lawyer shall not communicate, ... as to the merits of the cause with a judge ... before whom the proceeding is pending, except:
>
> (1) In the course of official proceedings in the cause.
>
> (2) In writing if a copy is promptly delivered to opposing counsel or to the adverse party if not represented by a lawyer.
>
> (3) Orally upon adequate notice to opposing counsel or to the adverse party if not represented by a lawyer.
>
> (4) As otherwise authorized by law.

Lesyshen fails to meet exceptions (1)-(3). Nor does she meet exception (4) because her communications to the judge were not "otherwise authorized by law." We agree with one commentator who interprets the fourth exception to include only *ex parte* communications for the purpose of "obtain[ing] ex parte restraining orders, submissions made in camera by order of the judge, or similarly rare occasions." Charles W. Wolfram, *Modern Legal Ethics* § 11.3, at 605 (1986).

We agree with the board that the situation here was similar to that in *Committee on Professional Ethics & Conduct v. Postma,* 430 N.W.2d 387 (Iowa 1988). There we said:

> On several counts the ex parte presentation of the order [to the judge] was a serious violation of professional ethics. Under DR 7–110(B) ..., a lawyer shall not communicate orally with a judge concerning the merits of a controversy without adequate notice to the opposing counsel.
>
> The violation was seriously aggravated in this case because of all the things Postma did not disclose to the judge. The judge was not told that VanderWel was represented by an attorney and that neither the attorney nor VanderWel were notified of the application.... The judge was not told VanderWel's version of the controversy. Because these matters were not disclosed the judge was deceived about the effect of the order he was persuaded to sign. This amounted to a misrepresentation of material facts by an attorney to a

court. This is a gravely serious breach of professional ethics.

*Id.* at 391.

Likewise here, Lesyshen did not tell the judge that Pircer was represented by counsel. Nor did she tell the judge about Kirk's letter to Burt and the circumstances prompting the letter. The judge was therefore deceived into signing the change of custody order. Had the judge known about the true circumstances, we are convinced he would not have signed the order.

Neither lawyers nor judges should consider change of custody lightly. Children's lives can be adversely affected even if the decision is made after due deliberation following a proper hearing. Thus a judge should not ordinarily order a change of custody without a hearing after notice to the other party's counsel, or to the party if not represented by counsel. We are thus disturbed that the court signed the *ex parte* order in the first place.

We are equally disturbed by Kirk's actions in securing an *ex parte* order from the same judge quashing the original order. Instead, the judge should have set the matter down for immediate hearing on notice to Lesyshen, and then following the hearing, acted accordingly.

## III. Discipline.

We have consistently recognized that the appropriate discipline in a given case turns on "the nature of the violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and the attorney's fitness to continue in the practice of law." *Committee on Prof'l Ethics & Conduct v. Blomker,* 379 N.W.2d 19, 21 (Iowa 1985). We have also consistently recognized that

[f]undamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy.

The court system and the public we serve are damaged when our officers play fast and loose with the truth. The damage occurs without regard to whether misleading conduct is motivated by the client's interest or the lawyer's own.

*Bauerle,* 460 N.W.2d at 453.

Equally important is the fact that

[a] lawyer has a very special responsibility for candor and fairness in all his dealings with a court. Absent mutual trust and confidence between a judge and a lawyer— an officer of the court—the judicial process will be impeded and the administration of justice frustrated.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb,* 546 N.W.2d 215, 217–18 (Iowa 1996) (citation omitted).

Apparently, Lesyshen has yet to learn and appreciate these fundamental concepts. The forgery and *ex parte* communications are a serious breach of them. No less important is Lesyshen's neglect of her client's lawsuit. Multiple violations of our disciplinary rules such as occurred here call for enhanced disciplinary sanctions. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Alexander,* 574 N.W.2d 322, 327 (Iowa 1998). In addition, we may consider prior violations in imposing sanctions. *Committee on Prof'l Ethics & Conduct v. Stienstra,* 395 N.W.2d 638, 640 (Iowa 1986). Lesyshen has, in the past, been publicly reprimanded.

With all due respect to the commission, we must agree with the board that the commission's recommended sanction of suspension for sixty days is wholly inadequate. In a very recent case, we imposed a six month suspension for similar misconduct. *See Alexander,* 574 N.W.2d at 327. We think the misconduct here warrants no less a sanction. We therefore suspend Lesyshen's license to practice law in Iowa indefinitely, with no possibility of reinstatement for six months from the date of this opinion.

During the period of suspension, Lesyshen shall refrain from the practice of law as provided by Iowa Supreme Court Rule 118.12. Iowa Supreme Court Rule 118.13 shall govern an application for reinstatement. Unpaid costs, if any, are assessed against Lesyshen in accordance with Iowa Supreme Court Rule 118.22.

**LICENSE SUSPENDED.**