**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Michael T. PRACHT, Respondent.**

No. 01–0190.

Supreme Court of Iowa.

May 31, 2001.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Rex J. Ridenour and Anton J. Suchy, Davenport, for respondent.

LAVORATO, Chief Justice.

In this lawyer disciplinary proceeding, we review the Grievance Commission's recommendation that Michael T. Pracht's license to practice law in Iowa be suspended for two years. The recommended suspension is for Pracht's violations of DR 1–102(A)(4), (5), and (6) stemming from his unauthorized removal of court document filing system records from the Scott County District Court Clerk's office. Upon our de novo review, we agree with the commission that a two year suspension is warranted.

## I. Facts.

The facts in this case are for the most part undisputed. Michael "Mick" Pracht practices law in Davenport. He has practiced law since 1976. His practice consists primarily of real estate transactions and preparation of title abstracts. Pracht's work often required him to spend much of his day in the Scott County Courthouse in the offices of the auditor, recorder, and clerk of court.

Marlene Nelson is the clerk of court. In her capacity as clerk, Nelson is responsible for approximately 55,000 active court files located in the clerk's office, plus an additional 120,000 inactive files stored in the courthouse basement.

Through the years, an honor system had developed in which lawyers were allowed to remove court files for certain periods of time. According to the system in place just before the events in question, lawyers could "check out" files for twenty-four hours. However, in doing so, lawyers had to fill out a check-out card with his or her name, phone number, and file name and number. The lawyer had to leave the card in place of the removed file.

Over time, problems arose because lawyers would not put a properly completed card in place of the removed file or would not return the file within the specified time. Because of these breaches of the rule, the clerk's office had difficulty tracking case files. On occasion, clerk's office employees had to go to lawyers' offices to retrieve files. Additionally, at times, files would be missing on matters that were scheduled for hearing. In those instances, judges hearing the case had to rely on court documents furnished by the lawyers trying the case.

These problems prompted Judge John A. Nahra, Chief Judge of the Seventh Judicial District, to install a sensormatic electronic system in the clerk's office. The system called for placing mylar strips on case files. The strips would activate an audible alarm if a file was removed from the clerk's office without first being properly checked out and without the mylar strip being deactivated by office employees.

Before installing the system, Chief Judge Nahra informed the local bar by letter dated June 24, 1999 of his intentions to install the system. He asked lawyers to return all files to the clerk's office by July 2, 1999.

Following this communication, the clerk's office began receiving files in large numbers. Pracht, himself, returned 100 files to the clerk's office. The clerk of court made arrangements for fifteen people to come into the office on July 10 to put the mylar strips on the files.

Sometime after June 24 but before July 2, Pracht talked with Nelson. In this conversation, Nelson told Pracht that once the deadline had expired, the clerk's office was going to pull all remaining check-out cards and track down the remaining files.

Though he did not express his concern to Nelson, Pracht was frustrated because he believed Nelson was operating under the false assumption that for every missing file, there was a corresponding check-out card. He also believed that many files were missing for which no one had ever prepared check-out cards.

To "remedy" the problem, Pracht took matters into his own hands. On July 2, 1999, during office hours, Pracht and his son removed—without authorization—all remaining check-out cards from the clerk's office and from the storage area in the basement. Pracht's plan was to keep these cards hidden, intending to force the clerk's office to conduct a full inventory of every court file for which the office was responsible. Pracht apparently hoped that forcing a full accounting would lead Nelson to realize there were many more files missing than she believed. Later that afternoon, the clerk's office discovered the cards were missing.

The Scott County Sheriff's office and the Division of Criminal Investigation (DCI) began investigating immediately. Investigators placed crime scene tape in the clerk's office. They also checked files, cabinets, and desks for fingerprints. Additionally, they interviewed Chief Judge Nahra, asked several persons to take polygraph tests, and fingerprinted employees. They also questioned two local attorneys and searched the attorneys' garbage åt their homes and offices for signs of the removed cards. Pracht's removal of the cards caused the clerk's office to conduct a full inventory of its files.

On or about July 20, an attorney told William Davis, the Scott County Attorney, that Pracht probably had the missing cards. Davis confronted Pracht who admitted he had the cards and turned them over to Davis. Davis turned the cards over to Chief Judge Nahra.

In early December, Pracht met with Chief Judge Nahra at the Chief's suggestion and apologized for taking the cards. He explained his actions to the Chief by stating he knew the clerk's records better than the clerk herself, that there had been a "misappropriation" or "misallocation" of court funds amounting to between $100,000 and $250,000, and that by taking the cards, he hoped to prompt a full investigation. Pracht also told Chief Judge Nahra that there was a conspiracy that ran from the top of the system, which included the chief judge, through the clerk and through people on staff down through the ranks. Additionally, Pracht stated he had told this to the DCI investigators in July.

The allegations about the misappropriation were never mentioned in the DCI reports. Pracht had never mentioned these allegations to the Chief before this December meeting. Several weeks later, Pracht renewed the allegations during a second meeting with the Chief. Also present at this meeting were Pracht's attorney and another judge.

These allegations prompted another investigation by the DCI. Investigators reviewed approximately twenty-five years of clerk records, audit reports, and state court administration reports. The investigators also looked into Pracht's allegations that the previous chief judge was aware of the alleged misallocation and cover-up. The investigators ultimately concluded that there had been no misappropriation or misallocation of funds and no conspiracy. To the contrary, the investigators concluded the audits had approved all actions of the clerk.

The county attorney declined to file charges against Pracht because he believed Pracht had no criminal intent and placing a value on the check-out cards would be difficult. Chief Judge Nahra, however, barred Pracht from entering the clerk's office. Pracht never responded to a request from the attorney general's office as to whether he intended to voluntarily make restitution sufficient to cover the cost—approximately $12,000—of the file inventory.

On February 3, 2000, Pracht sent a letter of apology to the clerk's office. In it, Pracht stated that he would not have taken the check-out cards had he perceived the problems that would arise. He also stated that he never intended to cause any personal difficulties and that he merely wished "to assure that all of the files were inventoried and a complete attempt to [locate] the missing files." He further explained that when he learned of the investigation, he believed that it concerned missing files, not the missing check-out cards.

## II. Complaint.

On September 28, 2000, the Board of Professional Ethics and Conduct filed a complaint against Pracht. The board alleged that Pracht's actions constituted violations of Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(4) (lawyer shall not engage in conduct involving dishonesty, deceit, or misrepresentation), (5) (lawyer shall not engage in conduct prejudicial to the administration of justice), and (6) (lawyer shall not engage in conduct that adversely reflects on the fitness to practice law).

Pracht denied the allegations in his response to the board's request for admissions. In particular, he denied that he or his son had removed the check-out cards.

At the hearing on the complaint, Chief Judge Nahra, County Attorney Davis, Clerk of Court Nelson, and Pracht testified.

In his testimony, Pracht admitted that he had taken the cards. He testified further that he did so to force a full accounting of all court files as well as to make people aware of the "missing funds." He additionally admitted that he "probably shouldn't have taken the cards" and that "[b]esides joining the Marine Corps, [taking the cards] was probably the second dumbest thing [he] ever did."

Pracht also testified that in the early 1980s he first learned from a clerk-of-court employee about the alleged misappropriation of funds. He admitted he did not tell Nelson or the chief judge about these problems. His excuse for not doing so was that he believed both were involved in the misappropriation and cover-up and for that reason they would not have listened to him.

Following the hearing, the Grievance Commission found that the board had met its burden in proving the charges of unethical conduct. Citing a previous public reprimand, the serious nature of Pracht's actions, and his failure to appreciate the consequences of his actions, the commission recommended a two-year suspension. The commission also recommended that "[a] condition of his reinstatement should be a complete and satisfactory addressing of the issue involving restitution to the Judicial Branch."

### III. Scope of Review.

■ Pracht has not appealed from the commission's recommendation. *See* Ct. R. 118.11. However, he has filed a statement. We review the record de novo. Ct. R. 118.10. Although we give respectful consideration to the commission's recommendation, this court must ultimately determine what discipline is appropriate under the facts of each case. *Id.; Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga,* 619 N.W.2d 327, 329 (Iowa 2000).

However, we do give weight to the commission's findings, particularly when the credibility of a witness is in question. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lesyshen,* 585 N.W.2d 281, 283 (Iowa 1998).

■ The board must prove the alleged ethical violations by a convincing preponderance of the evidence, a burden of proof that is greater than in a civil case but less than in a criminal case. *Lyzenga,* 619 N.W.2d at 329.

### IV. Commission's Findings.

■ We agree with the commission that the board proved by a convincing preponderance of the evidence violations of DR 1–102(A)(4), (5), and (6).

In taking the check-out cards from the clerk's office and directing his son to remove the cards from the files in storage, Pracht clearly engaged in conduct evidencing dishonesty and deceit in violation of DR 1–102(A)(4). He compounded his wrongful conduct when he failed to come forward with the check-out cards once they were discovered missing. We agree with the commission that "[t]he very act itself involves deceit as [Pracht] removed the cards without any consent or knowledge on the clerk's part." He continued to conceal his possession of the cards until the county attorney directly confronted him. That he eventually admitted having the cards does not excuse his lengthy concealment of the truth.

Pracht testified that he did not realize that the police investigation centered on recovering the check-out cards. He claimed that he believed they were looking for other missing files. The commission did not believe Pracht. Nor do we. He had the cards, the investigation commenced immediately after he took them, and the missing cards were a "hot topic" of

conversation in the legal community. As Chief Judge Nahra testified, such a contention is "nonsense."

■ Pracht's conduct was also prejudicial to the administration of justice in violation of DR 1–102(A)(5). In taking and hiding the check-out cards, Pracht caused an intensive, resource-demanding investigation resulting in an expenditure of nearly $12,000. Innocent people were targeted. According to Nelson, the investigation caused "a lot of morale problems" among her staff.

Additionally, Pracht's unfounded allegations attacking the character and reputation of the former chief, the current chief, the clerk of court, and her staff caused an additional time consuming investigation, all for naught. Evidently, Pracht has no qualms about making such allegations because he continues to make them in the statement he filed with this court.

Given Pracht's long-time interaction with the clerk's office and his familiarity with the card check-out system, he was well aware of the impact his actions would have. As the commission recognized, the file cards were the only method the clerk's office had of knowing where the files were when they were checked out. Viewed in this manner, the cards were vital to the integrity of the court records. Pracht's actions and the resulting chaos surely damaged the ability of the clerk's office—indeed the whole of the Scott County District Court—to smoothly and efficiently administer justice. *See, e.g., Committee on Prof'l Ethics & Conduct v. Chipokas*, 493 N.W.2d 414, 418 (Iowa 1992) (determining that attorney's unauthorized acceptance of settlement offer that forced the district court to take valuable time to hear a subsequent suit to enforce the settlement that would not have occurred except for attorney's conduct was prejudicial to administration of justice); *In re Bock*, 128 N.J. 270, 271, 607 A.2d 1307, 1308 (1992) (determining that attorney's actions in faking his own death were prejudicial to the administration of justice when an ensuing "police manhunt" into his disappearance resulted in needless "expenditure of public funds and diversion of police from needed public-safety measures").

■ Pracht's actions also clearly reflect adversely on his fitness to practice law in violation of DR 1–102(A)(6). He never attempted to voice his concerns about the files to the clerk, her staff, or any judges. Rather, Pracht engaged in what the commission characterized as "vigilante justice" to bring to light what he thought were problems of integrity and efficiency in the clerk's office. Like the commission, we discern that Pracht displayed a cavalier attitude—and still does as evidenced by his statement to this court—that he was justified in doing what he did and in the end performed some great service in the interest of justice.

As an officer of the court, Pracht—as any other lawyer—has the responsibility to act in a manner that is not detrimental to the court. As an officer of the court, Pracht should help to improve the administration of justice in whatever way he can. In this instance, however, he crossed the line between helpful and harmful conduct.

## V. Discipline.

■ A variety of important considerations guide our determination of the appropriate discipline. They include the nature of the alleged violations, the need for deterrence, the protection of the public, the maintenance of the reputation of the bar, and Pracht's fitness to continue in the practice of law. *See Lyzenga*, 619 N.W.2d at 329–30.

This court has also consistently recognized that

"[f]undamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth. The damage occurs without regard to whether misleading conduct is motivated by the client's interest or the lawyer's own."

*Lesyshen,* 585 N.W.2d at 288 quoting *Committee on Prof'l Ethics & Conduct v. Bauerle,* 460 N.W.2d 452, 453 (Iowa 1990)).

Equally important is that

"[a] lawyer has a very special responsibility for candor and fairness in all his dealings with a court. Absent mutual trust and confidence between a judge and a lawyer—an officer of the court—the judicial process will be impeded and the administration of justice frustrated."

*Id.* (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb,* 546 N.W.2d 215, 217–18 (Iowa 1996)).

Pracht's actions reflect his disdain for these basic considerations—considerations that should guide lawyers in dealing with the court. Additionally, Pracht's continued insistence that he was forced to commit his misdeeds to expose the improprieties of others smacks of little more than blame-shifting. Although the board did not allege Pracht's unfounded allegations of misappropriation of funds as separate ethical violations, these allegations nevertheless further evidence his tendency to blame others rather than himself.

Furthermore, this is not the first time Pracht has violated our disciplinary rules. *See Committee on Prof'l Ethics & Conduct v. Pracht,* 505 N.W.2d 196 (Iowa 1993) (holding that undertaking probate matters beyond competency, neglecting those matters, and failing to cooperate with Committee on Professional Ethics & Conduct warranted public reprimand). Though not similar to the violations at issue here, the prior reprimand is an aggravating factor. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner,* 599 N.W.2d 721, 730 (Iowa 1999).

As mentioned, the commission recommended a two-year suspension and we agree with that recommendation. We therefore suspend Pracht's license to practice law in Iowa with no possibility of reinstatement for two years from the filing date of this opinion. The suspension applies to all facets of the practice of law. *See* Ct. R. 118.12. Court Rule 118.12 shall govern any application for reinstatement.

We assess costs against Pracht pursuant to Court Rule 118.22.

**LICENSE SUSPENDED.**